**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LONG BEACH AREA CHAMBER OF
COMMERCE, a non-profit California
mutual benefit corporation, on
behalf of itself and its members;
LONG BEACH AREA CHAMBER OF
COMMERCE PAC; LONG BEACH
AREA CHAMBER OF COMMERCE—
MAYORAL PAC; LONG BEACH AREA
CHAMBER OF COMMERCE—CITY
COUNSEL PAC,
          *Plaintiffs-Appellees,*

        v.

CITY OF LONG BEACH,
          *Defendant-Appellant.*

No. 07-55691

D.C. No.
CV-06-01497-PSG

LONG BEACH AREA CHAMBER OF
COMMERCE, a non-profit California
mutual benefit corporation, on
behalf of itself and its members;
LONG BEACH AREA CHAMBER OF
COMMERCE PAC; LONG BEACH
AREA CHAMBER OF COMMERCE—
MAYORAL PAC; LONG BEACH AREA
CHAMBER
OF COMMERCE—CITY COUNSEL
PAC,
                    *Plaintiffs-Appellants,*

                    v.

CITY OF LONG BEACH,
                    *Defendant-Appellee.*

No. 07-56081
D.C. No.
CV-06-01497-PSG

LONG BEACH AREA CHAMBER OF
COMMERCE, a non-profit California
mutual benefit corporation, on
behalf of itself and its members;
LONG BEACH AREA CHAMBER OF
COMMERCE PAC; LONG BEACH
AREA CHAMBER OF COMMERCE—
MAYORAL PAC; LONG BEACH AREA
CHAMBER OF COMMERCE—CITY
COUNSEL PAC,
                   *Plaintiffs-Appellees,*

               v.

CITY OF LONG BEACH,
                   *Defendant-Appellant.*

No. 07-56190
D.C. No.
CV-06-01497-PSG
OPINION

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted
October 28, 2009—Los Angeles, California

Filed April 30, 2010

Before: Alex Kozinski, Chief Judge, Dorothy W. Nelson and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Wardlaw

**COUNSEL**

Charles H. Bell, Jr. and Jimmie E. Johnson of Bell, McAndrews, & Hiltachk, LLP, Sacramento, California; John C. Eastman of Chapman University Law School, Orange, California, for the appellees.

Robert E. Shannon and Monte H. Machit of the City Attorney's Office, Long Beach, California, for the appellant.

Reid Alan Cox and Stephen M. Hoersting of the Center for Competitive Politics, Alexandria, Virginia, for amicus curiae Center for Competitive Politics.

Richard Doyle, George Rios and Lisa Herrick of the Office of the City Attorney, San Jose, California, for amicus curiae League of California Cities.

**OPINION**

WARDLAW, Circuit Judge:

"[I]t is our law and our tradition that more speech, not less, is the governing rule" under the First Amendment. *Citizens United v. FEC*, 130 S. Ct. 876, 911 (2010). "More speech"

often means "more money." "This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money." *Buckley v. Valeo*, 424 U.S. 1, 19 (1976). Therefore, "[a] restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id*. That political spending is constitutionally protected "speech" has become a "cardinal tenet" of the Supreme Court's campaign finance jurisprudence. *Emily's List v. FEC*, 581 F.3d 1, 5 (D.C. Cir. 2009).

We must decide whether the Long Beach Campaign Reform Act ("LBCRA"), which prohibits "persons" from making any independent expenditures if they receive contributions above certain amounts, is constitutional as applied to the Long Beach Area Chamber of Commerce ("Chamber") and its affiliated political action committees ("Chamber PACs"). Because the Chamber lacks standing, and because the LBCRA does not withstand scrutiny as applied to the Chamber PACs, we vacate in part and reverse in part the district court's judgment that the LBCRA is unconstitutional as applied to the Chamber but constitutional as applied to the Chamber PACs.

## BACKGROUND

The City adopted the LBCRA in 1994. It provides that "[a]ny person who makes independent expenditures supporting or opposing a candidate shall not accept any contribution" in excess of $350 to $650, depending upon the office for which the candidate is running. Long Beach, Cal., Ordinances §§ 2.01.310, 2.01.610. "Person" is broadly defined to include "any individual, organization or political action committee whose contributions or expenditure activities are financed, maintained or controlled by any corporation, labor organization, association, political party or any other person or com-

mittee." *Id.* § 2.01.210(D). "Independent expenditures" are "expenditure[s] made by any person . . . in connection with a communication which expressly advocates the election or defeat of a clearly identified candidate . . . but which is not made to or at the behest of the affected candidate or committee." Cal. Gov't Code § 82031; Long Beach, Cal., Ordinances § 2.01.220 (adopting state law definition). An expenditure is not "independent" if it involves the control, direction, cooperation, consultation, coordination, request, or suggestion of a candidate. *See* Cal. Gov't Code § 82015; Cal. Admin. Code tit. 2, § 18225.7; *see also* Long Beach, Cal., Ordinances § 2.01.310 (discussing contribution limitations).

The Chamber is a non-profit mutual benefit corporation consisting of 1,400 dues-paying members, ninety percent of which are small businesses employing fewer than ten employees. Dues for Chamber members with fewer than ten employees range from $350 to $535, and dues for Chamber members with between ten and one-hundred employees range from $560 to $1,330. Some members with greater numbers of employees pay dues in excess of $10,000. The parties stipulate that the Chamber's dues constitute "contributions" under the LBCRA.[1] Because some of those dues exceed the LBCRA's contribution limitations, the LBCRA prohibits the Chamber from making any independent expenditures.

The Chamber's bylaws, however, do not permit it to make contributions or independent expenditures. Rather, the Chamber participates in City politics through the Chamber PACs — the Long Beach Area Chamber of Commerce PAC, the Long Beach Area Chamber of Commerce Mayoral PAC, and the Long Beach Area Chamber of Commerce City Council PAC — which are separate but affiliated organizations that make independent expenditures in support of select candidates. The

---

[1]The district court based its decision on the parties' joint stipulation of undisputed facts that accompanied their cross-motions for summary judgment.

Chamber PACs receive contributions from Chamber members who choose to direct a portion of their dues to the Chamber PACs. Non-Chamber members may also contribute to the Chamber PACs.

The Chamber and Chamber PACs ("Plaintiffs") sued to enjoin enforcement of the LBCRA, arguing that its contribution and expenditure limitations violate their rights of speech and association. On April 11, 2007, the district court ruled that the LBCRA is unconstitutional as applied to the Chamber. Relying on our decision in *Lincoln Club of Orange County v. City of Irvine*, 292 F.3d 934 (9th Cir. 2002), the district court applied strict scrutiny review because the LBCRA imposed a severe burden on the Chamber's freedoms of speech and association. As the district court explained, following enactment of the LBCRA, "[t]he Chamber is forced to alter its dues or organizational structure if it wishes to participate in city-wide elections and also wishes to continue to welcome members with more than 10 employees." That is, absent a drastic overhaul of its membership composition or its dues schedule, the Chamber would be precluded from making any independent expenditures even if its bylaws authorized it to do so.

Plaintiffs and the City each provided the district court with a proposed form of judgment purportedly reciting the district court's ruling. The district court rejected the Chamber's proposed form of judgment, which declared the LBCRA "unconstitutional as applied to *Plaintiffs* and other persons similarly situated" (emphasis added). Instead, it chose the City's proposed form of judgment, declaring the LBCRA "unconstitutional as applied to *Plaintiff* Long Beach Area Chamber of Commerce and other persons similarly situated" (emphasis added). Neither proposed form of judgment expressly addressed the Chamber PACs.

The judgment, entered on May 4, 2007, was timely appealed by the City. It then occurred to the parties that the

district court may not have resolved the question of the LBCRA's constitutionality as applied to the Chamber PACs. Naturally, the parties disagreed on this point. The Plaintiffs argued that the favorable judgment also embraced the Chamber PACs, as the Plaintiffs had recited in their proposed form of judgment, and the City contended otherwise. On July 12, 2007, upon motion by the Plaintiffs, the district court clarified its April 11, 2007, ruling, stating that it had not resolved the constitutionality of the LBCRA as applied to the Chamber PACs in the earlier order. It then "explicitly" concluded that "the Long Beach ordinance is constitutional as applied to the PACs." The district court applied the less demanding "closely drawn" level of scrutiny because it found that the Chamber PACs, which lack the Chamber's membership or dues structures, are less burdened by the LBCRA than is the Chamber. Therefore, the City's interests in preventing corruption or the appearance of corruption in its political process sufficiently justified the LBCRA's contribution limitations and consequent prohibition on spending as applied to the Chamber PACs. The Chamber PACs filed their notice of appeal on July 23, 2007.

## JURISDICTION AND STANDARD OF REVIEW

The district court exercised jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. "We review a district court's grant of summary judgment de novo." *Humphries v. County of Los Angeles*, 554 F.3d 1170, 1185 n.10 (9th Cir. 2009). Here, the parties filed cross-motions for summary judgment and stipulated as to the relevant facts. We therefore review the district court's legal determinations, including constitutional rulings, de novo. *See Bjustrom v. Trust One Mortgage Corp.*, 322 F.3d 1201, 1205 (9th Cir. 2003) ("The parties agree that the facts are not in dispute. We review de novo pure questions of law decided on summary judgment.").

## DISCUSSION

## I. Jurisdiction

## A.   Standing

As stated in the parties' stipulation, the City "no longer contends that the Plaintiffs lack standing or that the Plaintiffs' complaint does not present an actual controversy." That litigating posture, however, is insufficient to establish our jurisdiction. The role of the courts is "neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies." *Maldonado v. Morales*, 556 F.3d 1037, 1044 (9th Cir. 2009) (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc)). We therefore assess the parties' standing before proceeding to the merits of their dispute. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)*; D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1035 (9th Cir. 2008).

**[1]** To establish Article III standing, a plaintiff must show that "it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," that "the injury is fairly traceable to the challenged action of the defendant," and that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 771 (9th Cir. 2006) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)). Of course, Plaintiffs need not "await the consummation of threatened injury to obtain preventive relief." *Blum v. Yaretsky*, 457 U.S. 991, 1000 (1982). Instead, where a party seeks prospective relief, "[t]he question becomes whether any perceived threat to [the plaintiff] is sufficiently real and immediate to show an existing controversy." *Id.*; *see also Lujan*, 504 U.S. at 564 (examining imminence of asserted injury); *City of Los Angeles v. Lyons*,

461 U.S. 95, 105 (1983) (examining likelihood that plaintiff would suffer future injury).

**[2]** We conclude that the Chamber PACs have Article III standing, while the Chamber itself does not. The Chamber has failed to demonstrate that it has suffered or faces a real and immediate threat of suffering an injury that is fairly traceable to the LBCRA. The Chamber's own bylaws do not authorize it to make contributions or independent expenditures, and the factual record is devoid of any indication that the Chamber either plans to modify those bylaws or even that it desires to do so. The Chamber suggests that it may wish to make contributions or independent expenditures in the future, but this equivocal assertion is hardly sufficient to create a case or controversy. As the Supreme Court has explained, "Such 'some day' intentions — without any description of concrete plans, or indeed even any specification of when the some day will be — do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564 (emphasis omitted). Therefore, the district court did not have jurisdiction over the Chamber's action.[2]

**[3]** Unlike the Chamber, the Chamber PACs do make independent expenditures. Indeed, they were formed for the very purpose of engaging in political activities that support the Chamber's objectives. While the factual record does not detail the precise nature of the contributions that the Chamber PACs receive, it is probable that they are, or will be, offered contri-

---

[2]The Chamber's counsel referred to allegations in the complaint when we expressed concern as to standing during oral argument. While those allegations might be sufficient to overcome a motion to dismiss, they are insufficient to withstand summary judgment, where the factual record is dispositive. *See Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1255-56 (9th Cir. 2008) ("In response to a summary judgment motion or a trial court's post-pleading stage order to establish Article III standing, a plaintiff can no longer rest on 'mere allegations' but must set forth by affidavit or other admissible evidence 'specific facts' as delineated in Federal Rule of Civil Procedure 56(e) as to the existence of such standing.").

butions in excess of the LBCRA's limitations, given the Chamber's dues structure and contribution scheme and the wide range of entities from which the Chamber PACs receive contributions. Because the LBCRA poses a "real and immediate" threat to the Chamber PACs' ability to accept certain contributions or to make any independent expenditures, they have standing to sue. *See Lyons*, 461 U.S. at 101-02.

## B.    Timeliness

The City asserts that we lack jurisdiction over the Chamber PACs' appeal because their notice of appeal is untimely. A notice of appeal must be filed within thirty days of entry of the order or judgment from which the appeal is taken. Fed. R. App. P. 4(a)(1). With a few exceptions not applicable here, an appeal may be taken only from a final order or judgment. *See* 28 U.S.C. § 1291; *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 430 (1985) ("[T]he final judgment rule promotes efficient judicial administration while at the same time emphasizing the deference appellate courts owe to the district judge's decisions on the many questions of law and fact that arise before judgment."). A judgment is final if it fully adjudicates the issues and clearly evinces the district court's intention that it be that court's final act in the matter. *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 870 (9th Cir. 2004).

**[4]** The City contends that the Chamber PACs are appealing the May 4, 2007, judgment of the district court, and that their July 23, 2007, notice of appeal is more than fifty days late. However, the May 4, 2007, judgment does not indicate that the district court ruled on, let alone denied, summary judgment to the three Chamber PACs.[3] That judgment

---

[3]It is apparent that the City itself created any ambiguity that the May 4, 2007, judgment presented. The City drafted the order later adopted by the district court, which altered the language used by the district court in its April 11 order from "Plaintiffs" to "Plaintiff Long Beach Area Chamber of Commerce." That order also omitted any reference to the Chamber PACs, unlike Plaintiffs' proposed form of order which granted judgment in favor of "Plaintiffs."

addressed the Chamber only. Therefore, as of May 4, 2007, there was no adverse final judgment from which the Chamber PACs could appeal. It was not until the court filed its July 12, 2007, order that it expressly and finally adjudicated all of the issues related to summary judgment as to the Chamber PACs, effectively denying the Chamber PACs' constitutional challenge. The Chamber PACs timely filed their notice of appeal from that order eleven days later.

The City alternatively argues (for the first time during oral argument) that its own notice of appeal from the April 11, 2007, order divested the district court of jurisdiction to enter a subsequent order resolving the Chamber PACs' motion. *See* Fed. R. Civ. P. 60(a) (requiring district court to obtain leave of appellate court to issue clarification once a notice of appeal has been filed). However, "where an appeal is taken from a judgment which does not finally determine the entire action, the appeal does not prevent the district court from proceeding with matters not involved in the appeal." *Britton v. Co-op Banking Group*, 916 F.2d 1405, 1411 (9th Cir. 1990) (citation and internal quotation marks omitted); *see also Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (notice of appeal divests the district court of "control over those aspects of the case involved in the appeal"). The district court entered judgment granting the motion as to the Chamber on May 4, 2007, and the City's notice of appeal was timely filed, thus vesting our court with jurisdiction over that matter. Because the district court's May 4, 2007, judgment did not deny the motion as to the Chamber PACs, however, the district court retained jurisdiction over that motion and was free to clarify it or rule on it if the court had not previously done so. Moreover, if we were to accept the City's argument that the May 4, 2007, grant of summary judgment embraced the Chamber PACs' claim, there was no adverse judgment from which the Chamber PACs could appeal. Therefore, the district court acted wholly within its jurisdictional bounds when it issued the July 12, 2007, order. The Chamber PACs' notice of appeal was timely filed, and we have jurisdiction to review

it. Although it follows from this conclusion that the City's appeal was filed prematurely, we also have jurisdiction over that appeal because "orders adjudicating only some of the claims may be treated as final orders if the remaining claims have subsequently been finalized." *Anderson v. Allstate Ins. Co.*, 630 F.2d 677, 680 (9th Cir. 1980).

## II.  First Amendment Analysis

**[5]** "In *Buckley* and subsequent cases, [the Supreme Court has] subjected restrictions on campaign expenditures to closer scrutiny than limits on campaign contributions." *McConnell v. FEC*, 540 U.S. 93, 134 (2003); *see also Lincoln Club*, 292 F.3d at 938 (discussing different levels of scrutiny). "[C]ontribution limitations are permissible as long as the Government demonstrates that the limits are 'closely drawn' to match a 'sufficiently important interest.' " *Randall v. Sorrell*, 548 U.S. 230, 247 (2006); *see also Davis v. FEC*, 128 S. Ct. 2759, 2770 (2008) ("[S]uch limits . . . cannot stand unless they are 'closely drawn' to serve a 'sufficiently important interest.' ").[4] By contrast, expenditure limitations are subject to

---

[4]The Supreme Court has not yet explicitly discarded "closely drawn scrutiny," as some Justices have urged. *See, e.g.*, *Randall*, 548 U.S. at 267 (Thomas, J., concurring in the judgment) ("I would overrule *Buckley* and subject both the contribution and expenditure restrictions of Act 64 to strict scrutiny, which they would fail."); *see also McConnell*, 540 U.S. at 137 ("Our application of this less rigorous degree of scrutiny has given rise to significant criticism in the past from our dissenting colleagues."). In *Citizens United*, the Supreme Court stated: "[P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence. Laws that burden political speech are 'subject to strict scrutiny.' " *Citizens United*, 130 S. Ct. at 898 (quoting *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 464 (2007)). It is unclear whether this unqualified statement is the death knell for closely drawn scrutiny or whether it was intended only to reaffirm the long standing principle that expenditure limitations, like those at issue in *Citizens United*, are subject to strict scrutiny. We need not read tea leaves to decide this appeal, however, because, as shown below, the LBCRA is unconstitutional as applied to the Chamber PACs under either "closely drawn" or "strict" scrutiny.

strict scrutiny, which requires narrow tailoring to meet a compelling governmental interest. *See Citizens United*, 130 S. Ct. at 898; *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 464 (2007). Thus, "the Supreme Court has generally approved statutory limits on contributions to candidates and political parties," but it "has rejected expenditure limits on individuals, groups, candidates, and parties." *Emily's List*, 581 F.3d at 8 (emphasis omitted).

Contribution limitations are treated differently from expenditure limitations because they generally "entail[ ] only a marginal restriction upon the contributor's ability to engage in free communication." *Buckley*, 424 U.S. at 20. They "permit[ ] the symbolic expression of support evidenced by a contribution but do[ ] not in any way infringe the contributor's freedom to discuss candidates and issues." *Id.* at 21. By contrast, "expenditure ceilings impose significantly more severe restrictions on protected freedoms of political expression and association." *Id.* at 23. As the *Buckley* Court explained, "Being free to engage in unlimited political expression subject to a ceiling on expenditures is like being free to drive an automobile as far and as often as one desires on a single tank of gasoline." *Id.* at 19 n.18. Expenditure limitations may restrict the breadth and depth of political dialogue, and they "preclude[ ] most associations from effectively amplifying the voice of their adherents, the original basis for the recognition of First Amendment protection of the freedom of association." *Id.* at 22; *see also Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 386-88 (2000) (discussing application of expenditure-contribution distinction to associational rights).

Since *Buckley* was decided, governments at all levels have enacted campaign finance regulations. *See, e.g.*, 2 U.S.C. § 431 et seq. (Federal Election Campaign Act); Cal. Gov't Code § 81000 et seq. (California Political Reform Act); *see also Citizens United*, 130 S. Ct. at 897 (detailing "extensive regulations" of PACs). But "[p]olitical speech is so ingrained in our culture that speakers find ways to circumvent [these]

campaign finance laws." *Citizens United*, 130 S. Ct. at 912. As political strategists have devised novel ways to fund electoral politics, legislative bodies have reacted in kind to the "hard lesson of circumvention" by enacting ever-more complicated campaign finance regulations that defy easy classification under *Buckley*'s doctrinal framework. *McConnell*, 540 U.S. at 165. The LBCRA is one such regulation. It limits the amount of contributions an entity may receive while simultaneously prohibiting independent expenditures by any entity that receives contributions exceeding those limitations. As the district court observed, this form of regulation is not subject to easy classification as a contribution limitation or an expenditure limitation.

**[6]** This appeal does not turn on the LBCRA's technical classification as an expenditure limitation or a contribution limitation, however, because the LBCRA does not withstand scrutiny under the constitutional standards applicable to either type of campaign finance regulation. Though the City identifies several governmental interests that purportedly are served by the LBCRA, it has not shown that any is "sufficiently important" to support the LBCRA's application to the Chamber PACs in this case.

## A.    Anti-Distortion Rationale

**[7]** One of the LBCRA's stated purposes is to provide the City's residents and interest groups with "a fair and equal opportunity to participate in Municipal elective and governmental processes." Long Beach, Cal., Ordinances § 2.01.130(A); *see also id*. § 2.01.130(H) ("To reduce the excessive fund-raising advantage of incumbents and thus encourage competition for elective office."). However, "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley*, 424 U.S. at 48-49. Therefore, "the Court has ruled that the Government cannot limit campaign contributions and expen-

ditures to achieve 'equalization.' " *Emily's List*, 581 F.3d at 5. In *Davis*, the Court warned that restricting speech to " 'level electoral opportunities' has ominous implications because it would permit Congress to arrogate the voters' authority to evaluate the strengths of candidates competing for office." *Davis*, 128 S. Ct. at 2773. The *Davis* Court concluded that "prior decisions . . . provide no support for the proposition that this is a legitimate government objective." *Id*. The Supreme Court recently reaffirmed these views, stating that it is "unlawful" for the government "to command where a person may get his or her information or what distrusted source he or she may not hear." *Citizens United*, 130 S. Ct. at 908.

In its briefs and at oral argument, the City argued that these principles could be set aside under *Austin v. Mich. State Chamber of Commerce*, 494 U.S. 652 (1990), in which the Court upheld restrictions on independent expenditures by corporations, noting that the government had a compelling interest in combating "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form." *Id.* at 660. However, the Supreme Court has overruled *Austin* and explicitly rejected the "anti-distortion rationale" upon which it rested: "Political speech is indispensable to decisionmaking in a democracy, and this is no less true because the speech comes from a corporation rather than an individual. . . . This protection for speech is inconsistent with *Austin*'s anti-distortion rationale." *Citizens United*, 130 S. Ct. at 904 (internal quotation marks omitted); *see also id.* at 912-13 (noting that *Austin* "was not well reasoned," "is undermined by experience," and does not implicate any "serious reliance interests"). Therefore, we find unavailing the City's anti-distortion rationale for the LBCRA's application to the Chamber PACs.

### B. Time Protection Rationale

[8] The City also states that the LBCRA is intended to "limit overall expenditures in campaigns, thereby reducing the

pressure on candidates to raise large campaign war chests for defensive purposes." Long Beach, Cal., Ordinances § 2.01.130(D); *see also id.* § 2.01.130(I) ("To allow candidates and officeholders to spend a lesser proportion of their time on fund raising and a greater proportion of their time dealing with issues of importance to their constituents."). However, in *Buckley*, the Supreme Court explained that "[t]he First Amendment denies government the power to determine that spending to promote one's political views is wasteful, excessive, or unwise." *Buckley*, 424 U.S. at 57. More recently, the Supreme Court explicitly rejected what it described as the "time protection rationale" for campaign finance regulations, finding "unpersuasive" the argument that government may restrict campaign finance activity "to protect candidates from spending too much time raising money rather than devoting that time to campaigning among ordinary voters." *Randall*, 548 U.S. at 243-45. Therefore, the City's interest in reducing political fundraising efforts cannot support the LBCRA's application to the Chamber PACs.

## C.   Anti-Corruption Rationale

**[9]** Finally, the City advances an anti-corruption rationale to support the LBCRA's application to the Chamber PACs. One of the LBCRA's stated purposes is "[t]o reduce the influence of large contributors with a specific financial stake in matters before the City Council, thus countering the perception that decisions are influenced more by the size of contributions than the best interests of the people of the City." Long Beach, Cal., Ordinances § 2.01.130(B); *see also id.* § 2.01.130(K) ("To help restore public trust in local governmental and electoral institutions."). In its brief, the City asserts that the LBCRA "prevent[s] corruption or the appearance of corruption" and that the large amount of money spent on City elections "has caused a public perception that votes are being improperly influenced by monetary contributions."

**[10]** The Supreme Court has concluded that "preventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances." *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496-97 (1985) ("*NCPAC*"); *see also Davis*, 128 S. Ct. at 2773; *Randall*, 548 U.S. at 268. This interest was sometimes broadly construed in the expenditures context before the Supreme Court's recent decision in *Citizens United*, in which it stated: "When *Buckley* identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to quid pro quo corruption." *Citizens United*, 130 S. Ct. at 909.[5] "The fact that speakers may have influence over or access to elected officials does not mean that these officials are corrupt," and "[t]he appearance of influence or access . . . will not cause the electorate to lose faith in our democracy." *Id.* at 910.

---

[5]We do not fault the City for its failure to narrow its asserted anti-corruption interest to quid pro quo corruption only, as opposed to money spent to obtain "influence over or access to elected officials." *Citizens United*, 130 S. Ct. at 910. The City did not have the benefit of the Supreme Court's recent decision in *Citizens United* when it enacted the LBCRA or when it defended the LBCRA's constitutionality before the district court and on appeal. Before *Citizens United* was decided, it was unclear whether expenditures regulations were reviewed in light of the broader definition of "corruption" reflected in the City's arguments. *See, e.g.*, *Shrink Mo.*, 528 U.S. at 389 ("In speaking of 'improper influence' and 'opportunities for abuse' in addition to 'quid pro quo arrangements,' we recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors. These were the obvious points behind our recognition that the Congress could constitutionally address the power of money 'to influence governmental action' in ways less 'blatant and specific' than bribery." (quoting *Buckley*, 424 U.S. at 28)); *McConnell*, 540 U.S. at 143 ("Our cases have made clear that the prevention of corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits. We have not limited that interest to the elimination of cash-for-votes exchanges.").

Supreme Court precedent forecloses the City's argument that independent expenditures by independent expenditure committees ("IECs"), like the Chamber PACs, raise the specter of corruption or the appearance thereof. Moreover, the City's broadly based anti-corruption rationale for restricting contributions to IECs is lacking in legal and factual support because the City has not offered sufficient evidence of corruption to support its asserted governmental interest in restricting contributions to IECs.

## 1.    Expenditure Limitations

**[11]** "By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate." *Citizens United*, 130 S. Ct. at 910. An expenditure that is made with the control, direction, cooperation, consultation, coordination, request, or suggestion of a candidate is a contribution, not an independent expenditure. Cal. Gov't Code § 82015; Cal. Admin. Code tit. 2, § 18225.7. For instance, the Chamber PACs could be subject to criminal liability if they made payments in coordination with candidates or their campaigns but failed to disclose the payments as contributions. *See* Cal. Gov't Code §§ 84200, 84211, 91000. It is " '[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent [that] alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate.' " *Citizens United*, 130 S. Ct. at 908 (quoting *Buckley*, 424 U.S. at 47); *see also FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 452 (2001) (*Colorado II*) (distinguishing between "independent" and "coordinated" expenditures). In short, "independent expenditures . . . do not give rise to corruption or the appearance of corruption." *Citizens United*, 130 S. Ct. at 909; *see also NCPAC*, 470 U.S. at 497 ("[There is] no tendency in such expenditures, uncoordinated with the candidate or his campaign, to corrupt or to give the appearance of corruption.").

**[12]** It necessarily follows that the City may not impose financial limits on the Chamber PACs' independent expenditures. This conclusion is compelled by the long and growing line of Supreme Court cases concluding that limitations on independent expenditures are unconstitutional. *See Buckley*, 424 U.S. at 45 ("We find that the governmental interest in preventing corruption and the appearance of corruption is inadequate to justify § 608(e)(1)'s ceiling on independent expenditures."); *Colo. Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 618 (1996) ("*Colorado I*") ("We do not see how a Constitution that grants to individuals, candidates, and ordinary political committees the right to make unlimited independent expenditures could deny the same right to political parties."); *Randall*, 548 U.S. at 246 (limitations on independent expenditures by candidates violate the First Amendment); *NCPAC*, 470 U.S. at 499 ("A tendency to demonstrate distrust of PACs is not sufficient" to sustain a restriction on their expenditures); *Citizens United*, 130 S. Ct. at 913 (limitations on independent expenditures by corporations violate the First Amendment).

## 2.   Contribution Limitations

**[13]** Nor has the City shown that contributions to the Chamber PACs for use as independent expenditures raise the specter of corruption or the appearance thereof. The Supreme Court has upheld limitations on contributions to entities whose relationships with candidates are sufficiently close to justify concerns about corruption or the appearance thereof. For example, in *McConnell*, the Supreme Court upheld limitations on contributions to political parties because "the close relationship between federal officeholders and the national parties, as well as the means by which parties have traded on that relationship, . . . have made all large soft-money contributions to national parties suspect." *McConnell*, 540 U.S. at 154-55. Similarly, in *California Medical Association v. FEC*, 453 U.S. 182 (1981), the Supreme Court upheld limitations on contributions to "multicandidate political committees"

because their close relationship with candidates and office-holders made them "conduits for contributions to candidates, and as such they pose[d] a perceived threat of actual or potential corruption." *Id.* at 203 (Blackmun, J., concurring in part and concurring in the judgment); *see also id.* at 197 (maj. op.) ("[T]he rights of a contributor are . . . not impaired by limits on the amount he may give to a multicandidate political committee . . . which advocates the views and candidacies of a number of candidates.").

However, the need for contribution limitations to combat corruption or the appearance thereof tends to decrease as the link between the candidate and the regulated entity becomes more attenuated. As the Fourth Circuit has aptly explained:

> Unsurprisingly, the strength of the state's interest in preventing corruption is highly correlated to the nature of the contribution's recipient. Thus, the state's interest in the prevention of corruption — and, therefore, its power to impose contribution limits — is strongest when the state limits contributions made directly to political candidates . . . . As one moves away from the case in which a donor gives money directly to a candidate, however, the state's interest in preventing corruption necessarily decreases.

*N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 291 (4th Cir. 2008). The D.C. Circuit has since endorsed this rationale. *See Emily's List*, 581 F.3d at 11; *see also id.* at 6 (the anticorruption interest justifies limits on contributions to parties "[b]ased on the close relationship between candidates and parties").

**[14]** The Chamber PACs are several significant steps removed from "the case in which a donor gives money directly to a candidate." *Leake*, 525 F.3d at 291. They do not enjoy a "close connection and alignment," "close affiliation,"

and "nexus" with candidates. *McConnell*, 540 U.S. at 155; *see also Emily's List*, 581 F.3d at 14 ("In sum, it will not work to simply transport *McConnell*'s holding from the political party context to the non-profit setting."). Nor do the Chamber PACs operate as middlemen through which funds merely pass from donors to candidates. *See Cal. Med. Ass'n*, 453 U.S. at 197. They do not coordinate or prearrange their independent expenditures with candidates, and they do not take direction from candidates on how their dollars will be spent.[6] *See Colorado II*, 533 U.S. at 457 (discussing "serious threat of abuse" from coordinated expenditures). The Chamber PACs' relationship with candidates is, at best, attenuated. *See Emily's List*, 581 F.3d at 14 ("More fundamentally, non-profit groups do not have the same inherent relationship with federal candidates and officeholders that political parties do.").

[15] In fact, the record reveals only one interaction between the Chamber PACs and candidates for City office: interviews that the Chamber PACs' ten-member executive board conducts before deciding which candidates to support. Among the factors that the board considers is the candidate's position on policy questions affecting local businesses' ability to operate in the City. This fact alone does not support the City's anti-corruption rationale for applying the LBCRA to the Chamber PACs.[7] It comes as no surprise that the Chamber PACs would take appropriate steps to make informed decisions about how to spend their contributors' money. *See* NCPAC, 470 U.S. at 495 ("[T]he contributors obviously like

---

[6]As noted above, if the Chamber PACs did coordinate their expenditures with candidates, those expenditures would lose their "independent" status and would be subject to regulations governing contributions.

[7]The matter before us might be different if there were evidence that these interviews ended with a "wink and a nod" between the candidate and the Chamber PACs. For one thing, as noted above, such dealings could be subject to criminal prosecution to the extent that they actually transformed "independent expenditures" into "contributions" that were not disclosed as such. *See* Cal. Gov't Code §§ 82015, 91000; Cal. Admin. Code tit. 2 § 18225.7.

the message they are hearing from these organizations and want to add their voices to that message; otherwise they would not part with their money."). Though the City argues in its brief that "collective experience" indicates that "unrestricted financial contributions to . . . IECs have a corruptive influence," the City fails to identify a single fact or event to support that contention. Thus, "[o]n this record, . . . an exchange of political favors for uncoordinated expenditures remains a hypothetical possibility and nothing more." *Id.* at 498.

The City has even stipulated that it "is unaware of any instances of quid pro quo corruption of candidates in Long Beach municipal elections caused by contributions to independent expenditure committees, either since adoption of the Ordinance or which served as a basis for the Ordinance." This is hardly surprising "[g]iven the remove of independent expenditure committees from candidates themselves." *Leake*, 525 F.3d at 293. Tellingly, the only IEC activity that is even discussed in the record is a stipulation that, during the 2002 City election cycle, an IEC created and distributed a mailer supporting a candidate after the IEC had received contributions in excess of the LBCRA's limits. We are not told whether the candidate ever had any contact with the IEC, whether the money received or spent by the IEC had any corrupting influence on City politics, whether the voters suspected the IEC of corrupting the political process, or even whether the candidate won the race. The City's inability to identify a single instance of corruption, quid pro quo or otherwise, involving contributions to IECs for use as independent expenditures undermines its contention that the LBCRA's application to the Chamber PACs furthers its interest in combating corruption or the appearance thereof. *See Emily's List*, 581 F.3d at 14 ("Unlike the political parties examined in *McConnell*, there is no record evidence that non-profit entities have sold access to federal candidates and officeholders in exchange for large contributions."); *cf. SpeechNow.org v. FEC*, ___ F.3d ___, 2010 WL 1133857, at *16 (D.C. Cir.

2010) ("[B]ecause *Citizens United* holds that independent expenditures do not corrupt or give the appearance of corruption as a matter of law, then the government can have no anti-corruption interest in limiting contributions to independent expenditure-only organizations."). As Justice Blackmun noted in his concurrence in *California Medical Association*, "[C]ontributions to a committee that makes only independent expenditures pose no such threat [of corruption]." *Cal. Med. Ass'n*, 453 U.S. at 203.

Perhaps recognizing the deficiency of the evidentiary record before the district court, the California League of Cities ("League"), as amicus curiae, attempts to bolster the City's appeal, filing the texts of ordinances from other California municipalities as well as two reports documenting the rise of IECs and IEC spending. The League offers the two reports as "new and compelling evidence" supporting the City's anti-corruption rationale for the LBCRA. However, the district court was the appropriate forum in which to introduce this "evidence," and we refrain from usurping that court's function by entertaining new evidentiary submissions on appeal. *See* Fed. R. App. P. 10(a)(1) (record on appeal consists of original papers and records filed in the district court); *Barcamerica Int'l USA v. Tyfield Imps., Inc.*, 289 F.3d 589, 594 (9th Cir. 2002) (papers not filed in district court are not part of record on appeal). Second, we appreciate the League's observation that "[a] significant number of cities, including many of the largest municipalities, have adopted laws that limit contributions to independent committees that support or oppose candidates for local office." However, we can only decide the appeal before us, and our holding today extends only to the LBCRA as applied to the Chamber PACs and similarly situated entities.

Finally, the City urges that the LBCRA's enactment through voter initiative demonstrates a general perception of corruption in City politics. However, as noted above, the LBCRA covers "any person," the definition of which extends

far beyond IECs. City of Long Beach, Cal., Ordinances § 2.01.210(D). The City provides no information about the basis upon which the voters acted, and it would be purely speculative to conclude that passage of the LBCRA was a referendum on IECs in particular given the breadth of the LBRCA's coverage. Even if the law were a referendum on IECs, we could infer little from that fact; voters might have many reasons to want to silence those organizations that have nothing whatsoever to do with corruption.

**[16]** In sum, the City offers no basis on which to conclude that the Chamber PACs have the sort of close relationship with candidates that supports a plausible threat of corruption or the appearance thereof. IECs are intended to provide a distinct medium through which citizens may collectively enjoy and effectuate those expressive freedoms that they are entitled to exercise individually. Many "individuals contribute to a political organization in part because they regard such a contribution as a more effective means of advocacy than spending the money under their own personal direction." *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 261 (1986); *see also Colorado I*, 518 U.S. at 637 (1996) (Thomas, J. concurring) ("Political associations allow citizens to pool their resources and make their advocacy more effective."). Just as the soloist's song becomes more powerful when joined by a chorus of people singing along, a citizen's message may become more widely and effectively disseminated when he joins an IEC of like-minded citizens. *See Cal. Med. Ass'n*, 453 U.S. at 203 ("By pooling their resources, adherents of an association amplify their own voices.")*; NCPAC*, 470 U.S. at 494 ("NCPAC and FCM are mechanisms by which large numbers of individuals of modest means can join together in organizations which serve to 'amplif[y] the voice of their adherents.' " (quoting *Buckley*, 424 U.S. at 22)). Other circuits have endorsed this view of IECs. *See Emily's List*, 581 F.3d at 4 (The First Amendment "safeguards the right of citizens to band together and pool their resources as an unincorporated group or non-profit organization in order to express

their views about policy issues and candidates for public office."); *Leake*, 525 F.3d at 295 ("[I]ndependent expenditure political committees offer an opportunity for ordinary citizens to band together to speak on the issue or issues most important to them."). Nothing in the evidentiary record of this case indicates that the Chamber PACs should be considered differently. Therefore, the City's anti-corruption rationale does not support the LBCRA's limitations on contributions to the Chamber PACs.

## CONCLUSION

**[17]** We conclude that the Chamber lacks standing to challenge the constitutionality of the LBCRA. Therefore, we **VACATE** the district court's grant of summary judgment in favor of the Chamber and remand with instructions to dismiss the Chamber's claim for want of jurisdiction. We also conclude that the Chamber PACs' appeal was timely filed. Because the City has not advanced a governmental interest to support the LBCRA's application to the Chamber PACs, we **REVERSE** the district court's grant of summary judgment in favor of the City and against the Chamber PACs.

**VACATED and REMANDED in part; REVERSED in part.**