**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PHIL THALHEIMER; ASSOCIATED
BUILDERS & CONTRACTORS PAC,
sponsored by Associated Builders
& Contractors, Inc. San Diego
Chapter; LINCOLN CLUB OF SAN
DIEGO COUNTY; REPUBLICAN
PARTY OF SAN DIEGO; JOHN
NIENSTEDT, SR.,
         *Plaintiffs-Appellees,*

    v.

CITY OF SAN DIEGO,
         *Defendant-Appellant.*

No. 10-55322

D.C. No.
3:09-cv-02862-IEG-
WMC

PHIL THALHEIMER; ASSOCIATED
BUILDERS & CONTRACTORS PAC,
sponsored by Associated Builders
& Contractors, Inc. San Diego
Chapter; LINCOLN CLUB OF SAN
DIEGO COUNTY; REPUBLICAN
PARTY OF SAN DIEGO; JOHN
NIENSTEDT, SR.,
         *Plaintiffs-Appellees,*

    v.

CITY OF SAN DIEGO,
         *Defendant-Appellant.*

No. 10-55324

D.C. No.
3:09-cv-02862-IEG-
WMC

8067

PHIL THALHEIMER; ASSOCIATED
BUILDERS & CONTRACTORS PAC,
sponsored by Associated Builders
& Contractors, Inc. San Diego
Chapter; LINCOLN CLUB OF SAN
DIEGO COUNTY; REPUBLICAN
PARTY OF SAN DIEGO; JOHN
NIENSTEDT, SR.,
                    *Plaintiffs-Appellants,*

                    v.

CITY OF SAN DIEGO,
                    *Defendant-Appellee.*

No. 10-55434

D.C. No.
3:09-cv-02862-IEG-
WMC

OPINION

Appeal from the United States District Court
for the Southern District of California
Irma E. Gonzalez, Chief District Judge, Presiding

Argued and Submitted
October 4, 2010—Pasadena, California

Filed June 9, 2011

Before: Kim McLane Wardlaw and William A. Fletcher,
Circuit Judges, and Robert J. Timlin,
Senior District Judge.*

Opinion by Judge Wardlaw

---

*The Honorable Robert J. Timlin, Senior United States District Judge
for the Central District of California, sitting by designation.

---

## COUNSEL

Richard L. Hasen (argued); Dick A. Semerdjian, Schwartz Semerdjian Haile Ballard & Cauley LLP, San Diego, California, for the defendant-appellant.

James Bopp, Jr. (argued), Anita Y. Woudenberg, and Joseph E. La Rue, Bopp, Coleson & Bostrom, Terre Haute, Indiana; Gary D. Leasure, Law Offices of Gary D. Leasure, San Diego, California, for the plaintiffs-appellees.

J. Gerald Hebert, Tara Malloy, Paul S. Ryan, The Campaign Legal Center, Washington, DC, for the amici curiae Campaign Legal Center, Center for Governmental Studies, and Common Cause.

David Blair-Loy, ACLU Foundation of San Diego & Imperial Counties, San Diego, California, for the amicus curiae American Civil Liberties Union of San Diego & Imperial Counties.

---

## OPINION

WARDLAW, Circuit Judge:

The modern era of campaign finance reform began in 1972, following the infamous break-in at the Watergate hotel. Congress responded to the ensuing scandal by overhauling the Federal Election Campaign Act to impose new caps on politi-

cal spending, as states and cities followed suit with laws of their own. The City of San Diego (the "City") enacted its Municipal Election Campaign Control Ordinance ("ECCO") in 1973. *See* San Diego, Cal., Municipal Code ch. 2, art. 7, div. 29. Then, in *Buckley v. Valeo*, 424 U.S. 1, 14 (1976), the Supreme Court held that campaign finance regulations "operate in an area of the most fundamental First Amendment activities." The crucial constitutional distinction, according to the *Buckley* Court, was between limitations on campaign expenditures and campaign contributions. The Court reasoned that expenditure limits "represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech," while contribution limits "entail[ ] only a marginal restriction upon the contributor's ability to engage in free communication." *Id*. at 19-20. Since *Buckley*, the Supreme Court has considered numerous laws that regulate the flow of political money. Some have been upheld, others struck down. But in each case the Court's analysis continued to build upon the familiar *Buckley* distinction.

Recent Supreme Court decisions, notably *Citizens United v. FEC*, 130 S. Ct. 876 (2010), have once again placed the constitutionality of campaign finance reform in flux, inspiring new challenges to election laws across the country. This is one such case. Plaintiffs mount a First Amendment challenge to San Diego's campaign finance laws. The district court considered the constitutionality of five provisions and generally upheld the City's pure contribution limits, but enjoined a provision that restricts both the fundraising and spending of independent political committees. The district court correctly recognized that even as the campaign finance reform landscape has shifted, nearly four decades after the Watergate break-in *Buckley*'s expenditure-contribution distinction continues to frame the constitutional analysis of campaign finance regulations. Because the district court properly applied the applicable preliminary injunction standard in the context of the presently discernible rules governing campaign finance restrictions, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

ECCO is a comprehensive law governing all aspects of campaign finance in San Diego city elections. Plaintiffs Phil Thalheimer, a former and future city council candidate; ABC PAC, a political action committee for the Associated Builders and Contractors San Diego chapter; the Lincoln Club, a registered political action committee; the San Diego County Republican Party, the local branch of the national Party; and John Nienstedt, a San Diego resident who regularly contributes to local candidates and political committees, sued to enjoin enforcement of five ECCO provisions they claim violate their respective First Amendment rights, facially and as applied. Plaintiffs filed a verified complaint seeking a preliminary injunction to block enforcement of the challenged ECCO provisions before trial, a time period they noted would likely encompass at least two municipal elections: San Diego's June 8, 2010 primary, and the November 2, 2010 general election.

Plaintiffs challenged ECCO § 27.2936, which restricts the fundraising and spending of political committees, § 27.2938, which imposes a ban on contributions to candidates outside of a 12-month pre-election window, §§ 27.2950-51, which prohibit contributions by any non-individual entities, and § 27.2935, which imposes a $500 limit for contributions to candidates and committees supporting or opposing a candidate.

ECCO § 27.2936 applies to "general purpose recipient committees," defined elsewhere in the ordinance as committees "not controlled by a candidate" that receive $1,000 or more in annual donations for the purpose of supporting or opposing candidates or ballot measures. *Id.* at § 27.2903. Such committees may not "use a contribution for the purpose of supporting or opposing a candidate unless the contribution is attributable to an individual in an amount that does not exceed $500 per candidate per election." *Id.* at § 27.2936(b). The law applies only to contributions made with the specific

purpose of participation in municipal elections, thus excluding "dues, donations, fees, or other forms of monetary transactions" from its scope. *Id.* at § 27.2936(f). The specific dollar amount of the limits are adjusted every two years based on the Consumer Price Index. *Id.* at § 27.2937(a).

The temporal limit, ECCO § 27.2938, makes it unlawful for any candidate or candidate-controlled political committee "to solicit or accept contributions prior to the twelve months preceding the primary election for the office sought." *Id.* at § 27.2938(a). The San Diego Ethics Commission has interpreted this provision as also preventing candidates from spending their own money on their campaigns outside of the 12-month window.

The organizational contribution limit, ECCO § 27.2950, prohibits "any person other than an individual" from contributing to a candidate or candidate-controlled committee. *Id.* at § 27.2950(a). The ordinance defines "person" as including "any individual, proprietorship, firm, partnership, joint venture, syndicate, business trust, company, corporation, association, committee, labor union, or any other organization or group of persons acting in concert." *Id.* at § 27.2903. The effect of the provision is to bar contributions to candidates from all organizations and other non-individual entities. ECCO § 27.2951 underscores the prohibition by making it unlawful for candidates to accept contributions drawn against checking or credit card accounts "unless such account belongs to one or more individuals in their individual capacity." *Id.* at § 27.2951(a).[1]

---

[1]Since the district court entered its order, the City enacted a new law allowing political parties to contribute up to $1,000 per election to candidates in municipal elections. Plaintiffs challenged the new provision in a separate action and sought a preliminary injunction against enforcement pending trial, which the district court denied. The constitutionality of this new provision is not before us.

On February 16, the district court preliminarily enjoined enforcement of ECCO § 27.2936, the committee fund-raising/spending limit, but held that Plaintiffs were unlikely to succeed in their First Amendment challenge to the temporal contribution ban, § 27.2938, except as to the San Diego Ethics Commission's enforcement position that the temporal ban may prohibit candidates' spending their own money on their behalf. As to the non-individual contribution limits, §§ 27.2950 and 27.2951, the district court concluded that Plaintiffs were unlikely to succeed in their claim that the laws are unconstitutional as applied generally to corporations and other organizational entities, but enjoined the provisions as applied to political parties. The district court also concluded that Plaintiffs were unlikely to succeed in challenging ECCO § 27.2935, the City's $500 individual contribution limit. Plaintiffs do not appeal this portion of the ruling.

In a February 22 order, the district court clarified that its preliminary injunction against enforcement of § 27.2936, the committee fundraising and spending limit, applied to committees that make only independent expenditures, and covered contributions made by both individuals and non-individual entities. The district court also granted in part Plaintiffs' request for an injunction against § 27.2951, the limit on contributions drawn against non-individual entities' credit card and checking accounts, to the extent that it barred contributions drawn against organizational accounts to committees that make only independent expenditures. These cross-appeals ensued.

## II.  JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1292(a)(1). We review a district court's decision to grant or deny a preliminary injunction for abuse of discretion. *See Dominguez v. Schwarzenegger*, 596 F.3d 1087, 1092 (9th Cir. 2010). We review conclusions of law de novo, and findings of fact for

clear error. *Id*. "Under this standard, [a]s long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Id.* (quotations omitted). "This review is 'limited and deferential,' and it does not extend to the underlying merits of the case." *Johnson v. Couturier*, 572 F.3d 1067, 1078 (9th Cir. 2009) (quoting *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)).

### III.  DISCUSSION

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 24-25 (2008); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126-27 (9th Cir. 2009). The district court analyzed whether Plaintiffs were likely to prevail in challenging each ECCO provision. It properly considered the remaining *Winter* elements only as to claims it concluded were meritorious. *See Advertise.com, Inc. v. AOL Advertising, Inc.*, 616 F.3d 974, 982 (9th Cir. 2010).

Courts asked to issue preliminary injunctions based on First Amendment grounds face an inherent tension: the moving party bears the burden of showing likely success on the merits — a high burden if the injunction changes the status quo before trial — and yet within that merits determination the government bears the burden of justifying its speech-restrictive law. *Compare Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), *with United States v. Playboy Entm't Group*, 529 U.S. 803, 816 (2000). In *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423 (2006), the district court had entered a preliminary injunction to prevent the government from enforcing the Controlled Substances Act against a religious sect that used sacramental hallucinogenic

tea. The district court applied the "compelling interest test" from the Religious Freedom Restoration Act of 1993 (RFRA), which, like the First Amendment strict scrutiny standard, places the burden on the government to demonstrate that a law burdening religious exercise is the least restrictive means of furthering a compelling state interest. *Id.* at 424. Finding that the evidence presented by the parties was "in equipoise," the district court concluded that the government failed to carry its burden and the sect was likely to succeed on the merits, and the Tenth Circuit agreed. *Id.* at 426-27.

The Supreme Court affirmed, reasoning that the burden of proof at the preliminary injunction phase tracks the burden of proof at trial, and therefore "RFRA challenges should be adjudicated in the same manner as constitutionally mandated applications of the test, including at the preliminary injunction stage." *Id.* at 430. The Court relied on its earlier decision in *Ashcroft v. ACLU*, 542 U.S. 656 (2004), in which it affirmed a preliminary injunction against enforcement of the Child Online Protection Act (COPA) on First Amendment grounds. The *Ashcroft* Court explained the burden of proof at the preliminary injunction stage:

> In deciding whether to grant a preliminary injunction, a district court must consider whether the plaintiffs have demonstrated that they are likely to prevail on the merits . . . . As the Government bears the burden of proof on the ultimate question of COPA's constitutionality, respondents must be deemed likely to prevail unless the Government has shown that respondents' proposed less restrictive alternatives are less effective than COPA.

*Id.* at 666 (internal citations omitted).

**[1]** Therefore, in the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threat-

ened with infringement, at which point the burden shifts to the government to justify the restriction. *See also Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009) (explaining that the party seeking a preliminary injunction "has the general burden of establishing the elements necessary to obtain injunctive relief, [and] the city has the burden of justifying the restriction on speech").

A verified complaint may be treated as an affidavit, and, as such, it is evidence that may support injunctive relief. *See Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985); *Ross-Whitney Corp. v. Smith Kline & French Labs.*, 207 F.2d 190, 198 (9th Cir. 1953). According to Plaintiffs' verified complaint, Thalheimer, the former San Diego City Council candidate mulling another run for office, has created a campaign committee and would begin soliciting and accepting contributions now, but cannot because ECCO § 27.2938 prohibits such activity before the 12-month window. Thalheimer would also like to solicit, accept and use donations from organizational entities, but cannot because of ECCO § 27.2950's prohibition on contributions from non-individuals. He also intends to solicit contributions from individuals who own firms as sole proprietors and commingle their personal and business funds, but he cannot accept money from their business checking accounts or credit cards under ECCO § 27.2951.

Plaintiffs also presented evidence that the ABC PAC and the Lincoln Club, which receive contributions of over $500 from donors, including trusts, corporations and other business associations, would like to use such funds on independent expenditures, but are prohibited from doing so by ECCO § 27.2936. Similarly, the San Diego County Republican Party was prohibited from making direct contributions to local candidates by ECCO § 27.2950, which bars organizations from contributing to candidates' campaigns. And finally, Plaintiff Nienstedt declared that he would like to contribute money now to a candidate in a primary that is more than a year away,

but is prohibited from doing so by ECCO § 27.2938's temporal limitations.

The City argues that this evidence is insufficient to make out a colorable First Amendment claim, relying on *Citizens for Clean Gov't v. City of San Diego*, 474 F.3d 647 (9th Cir. 2007) ("*Citizens for Clean Gov't*"), for the general proposition that courts require particularly strong factual showings to resolve campaign finance disputes. There, Citizens for Clean Government (Citizens), a political committee, was established to advocate the recall of a city council member. The group challenged a provision of San Diego's campaign finance law — since repealed — that limited contributions to committees supporting or opposing candidates to $250. *Id.* at 649-50. Citizens argued that the law violated the First Amendment as applied to the signature-gathering phase of an election held to recall a sitting council member. *Id.* at 649. The district court denied Citizens' request for a preliminary injunction, we affirmed that decision, and the parties stipulated to a final judgment in favor of the City. *Id.* at 650. We then reversed that judgment, concluding that the City had failed to present evidence demonstrating that it had a sufficiently important governmental interest to justify its law in the context of the signature-gathering phase of a recall election. *Id.*

**[2]** Our conclusion in *Citizens for Clean Gov't* that the City, rather than the Plaintiffs, failed to produce sufficient evidence, underscores the special constitutional burden placed on the government to justify a law that restricts political speech. *See id.* at 653-54. Moreover, the present appeal involves a preliminary injunction and therefore we are bound by the deferential abuse of discretion standard of review. By contrast, in *Citizens for Clean Gov't* we conducted a *de novo* review of a final judgment. *Id.* at 650 ("Because this appeal relates to a permanent injunction, we are not constrained by the more limited standard of review that applied at the preliminary injunction phase of this litigation."). We therefore conclude that the district court applied the correct preliminary

injunction standard, and properly shifted the burden to the City to justify the ECCO provisions under review.

## A. Likelihood of Success on the Merits

### 1. ECCO § 27.2936: Contribution/Expenditure Limit for Committees

The *Buckley* Court established that laws limiting campaign expenditures are subject to strict scrutiny, but restrictions on contributions to candidates are judged under a lesser standard. 424 U.S. at 20. The Court reasoned that contribution limitations are less substantial restraints on individuals' political communication than expenditure limitations. *Id*. at 21. The *Buckley* Court also found a stronger governmental interest in regulating contributions than independent spending, because "the absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." *Id*. at 47.

The strict scrutiny standard of review for limitations on expenditures requires the government to prove that a law is narrowly tailored to further a compelling governmental interest. *See Citizens United*, 130 S. Ct. at 898. Contribution limits, on the other hand, need only be "closely drawn" to match a sufficiently important interest to survive a constitutional challenge. *See Randall v. Sorrell*, 548 U.S. 230, 247 (2006) (plurality opinion).

ECCO § 27.2936(b) makes it unlawful for a "general purpose recipient committee" — including independent committees that do not coordinate with candidates — "to use a contribution for the purpose of supporting or opposing a candidate unless the contribution is attributable to an individual in an amount that does not exceed $500 per candidate per election." Therefore, the provision is plausibly read as both a

contribution limit, and an expenditure limit. Although the parties dispute the applicable level of scrutiny, we find it unnecessary to place the provision in one category or the other because Plaintiffs are likely to succeed in demonstrating the law to be unconstitutional under either standard. *See Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 692-93 (9th Cir. 2010) (explaining that while a similar law was "not subject to easy classification as a contribution limitation or an expenditure limitation," resolving the issue was unnecessary because the law "does not withstand scrutiny under the constitutional standards applicable to either type of campaign finance regulation").

**[3]** "The Supreme Court has concluded that 'preventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances.' " *Id.* at 694 (quoting *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496-97 (1985)); *see also Davis v. FEC*, 554 U.S. 724, 741 (2008).[2] Accordingly, the City asserts only an anti-corruption interest to support ECCO § 27.2936's limitation on the spending and fundraising of independent committees. However, as the district court correctly determined, the Supreme Court has found the anti-corruption interest unavailing in the context of restrictions on independent expenditures, most recently in *Citizens United*.

In *Citizens United*, the Court considered the constitutionality of a federal law restricting corporate and union spending on "electioneering communications," defined as broadcasts aired in the run-up to an election that support or oppose a

---

[2]The Supreme Court has recognized that other governmental interests may legitimately support campaign finance regulations that do not directly limit contributions or expenditures. *See Buckley*, 424 U.S. at 66-67 (holding that providing information to the electorate is a sufficiently important state interest to justify campaign finance disclosure laws); *see also Human Life of Washington Inc. v. Brumsickle,* 624 F.3d 990, 1005-06 (9th Cir. 2010).

political candidate. 130 S. Ct. at 886-87. Citizens United, a nonprofit corporation, challenged the law because it feared sanctions for broadcasting via video-on-demand services a documentary critical of then-Senator Hillary Clinton during the 2008 presidential primary season. *Id*. at 887-88. The Court had recently upheld limits on electioneering communications in *McConnell v. FEC*, 540 U.S. 93, 203-09 (2003). That decision relied in part on *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 658-59 (1990), in which the Court held that due to the "unique legal and economic characteristics of corporations," the government could restrict corporate political spending in order to prevent the distortion of the political process.

**[4]** The *Citizens United* Court overruled *Austin* and the relevant portion of *McConnell*, holding that the anti-distortion rationale was not a valid governmental interest, and that "the Government may not suppress political speech on the basis of the speaker's corporate identity." *Citizens United*, 130 S. Ct. at 913. The Court also rejected the Government's argument that the law limiting spending on electioneering communications could be justified by an anti-corruption interest. It reasoned that the " 'absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate.' " *Id*. at 908 (quoting *Buckley*, 424 U.S. at 47). The Court stated that restricting independent expenditures on political speech has "a chilling effect extending well beyond the Government's interest in preventing *quid pro quo* corruption. The anti-corruption interest is not sufficient to displace the speech here in question." *Id*. at 908.

We applied *Citizens United* to a campaign regulation similar to the City's in *Long Beach*. There we considered the constitutionality of the Long Beach Campaign Reform Act (LBCRA) as applied to political action committees affiliated

with the Long Beach Area Chamber of Commerce. 603 F.3d at 687. LBCRA stated that " '[a]ny person who makes independent expenditures supporting or opposing a candidate shall not accept any contribution' in excess of $350 to $650, depending upon the office for which the candidate is running." *Id.* (quoting Long Beach, Cal., Ordinances §§ 2.01.310, 2.01.610). The term "person" was defined to include political committees. *Id.* The city of Long Beach offered an anti-corruption rationale to justify the law, which had the stated purpose of " 'reduc[ing] the influence of large contributors with a specific financial stake in matters before the City Council, thus countering the perception that decisions are influenced more by the size of contributions than the best interests of the people of the City.' " *Id.* at 694 (quoting Long Beach, Cal., Ordinances § 2.01.130(B)).

**[5]** We concluded that the *Citizens United* decision had narrowed the scope of the anti-corruption rationale to cover "quid pro quo corruption only, as opposed to money spent to obtain 'influence over or access to elected officials.' " *Id.* at 694 n.5 (quoting *Citizens United*, 130 S. Ct. at 910). Therefore, we held that the anti-corruption rationale failed to justify LBCRA's limitation on the receipt of contributions to support independent expenditures. *Id.* at 698-99. Other circuits have similarly read *Citizens United* as foreclosing the anti-corruption interest in the context of independent expenditures. *See, e.g., SpeechNow.org v. FEC*, 599 F.3d 686, 694-95 (D.C. Cir. 2010) (asserting that *Citizens United* held "as a matter of law that independent expenditures do not corrupt or create the appearance of *quid pro quo* corruption," and thus "contributions to groups that make only independent expenditures also cannot corrupt or create the appearance of corruption").

The City argues that while *Citizens United* partially overruled *McConnell*, the Court left intact a portion of the earlier decision upholding a limitation on how committees spend certain contributions. *McConnell* involved a constitutional challenge to the Bipartisan Campaign Reform Act of 2002

(BCRA), which amended the Federal Election Campaign Act (FECA) to add restrictions on the use of "soft money," or contributions made "to political parties for activities intended to influence state or local elections." 540 U.S. at 123. Congress sought to limit the parties' increasing use of soft money on federal campaigns by "prohibit[ing] national party committees and their agents from soliciting, receiving, directing, or spending any soft money," and preventing state party committees from using soft money on federal election activities. *Id*. at 133-34.

The *McConnell* Court held that these provisions "simply limit the source and individual amount of donations. That they do so by prohibiting the spending of soft money does not render them expenditure limitations." *Id*. at 139. In upholding the provisions, the Court rejected the argument that the anti-corruption interest was insufficient because the parties could use the contributions to make independent expenditures. *Id*. at 152. Given the "close connection and alignment of interests" between federal officeholders and candidates and the national political parties, the Court held that "large soft-money contributions to national parties are likely to create actual or apparent indebtedness on the part of federal officeholders, regardless of how those funds are ultimately used." *Id*. at 155.

Similarly, in *California Medical Association v. FEC*, 453 U.S. 182, 197-98 (1981) ("*CalMed*"), the Supreme Court relied on an anti-corruption interest to uphold limitations on contributions to "multicandidate political committees." The nonprofit California Medical Association (CMA) had formed the California Medical Political Action Committee (CalPAC), a registered political committee. *Id*. at 185. The FEC sanctioned the CMA for making contributions to CalPAC in excess of statutory limits, prompting the organizations to file a lawsuit challenging those limitations on First Amendment grounds. *Id*. at 186.

The *CalMed* Court explained that multi-candidate political committees may be formed independently of officeholders or

candidates, but by definition they contribute directly to five or more candidates for federal office. *Id*. at 185 n.1. It concluded that this direct donor relationship presented a risk of actual or apparent quid pro quo corruption. *Id*. at 197. Moreover, the Court noted that donors could exploit the structure of a multi-candidate PAC to evade individual candidate contribution limits. *Id*. at 198. Therefore, it upheld the limitation on contributions to these committees — regardless of how the committees ultimately spent the donations — as "an appropriate means by which Congress could seek to protect the integrity of the contribution restrictions upheld by this Court in *Buckley*." *Id*.

The City contends that this line of authority remains good law, and that it establishes that "contributions to independent groups *do* have the potential to corrupt." We rejected a similar argument in *Long Beach*. We explained that in *McConnell*, the Supreme Court "upheld limitations on contributions to political parties because 'the close relationship between federal officeholders and the national parties, as well as the means by which parties have traded on that relationship' " raised the same concerns about quid pro quo corruption that exist with candidate contributions but not with independent expenditures. *Long Beach*, 603 F.3d at 696 (quoting *McConnell*, 540 U.S. at 154-55). We likewise distinguished *CalMed*, because there the Court concluded that the multi-candidate political committees had a "close relationship with candidates and office holders [that] made them 'conduits for contributions to candidates, and as such they pose[d] a perceived threat of actual or potential corruption.' " *Id*. (quoting *CalMed*, 453 U.S. at 203 (Blackmun, J., concurring in part and concurring in the judgment)).

We therefore determined in *Long Beach* that the contribution limits in *McConnell* and *CalMed* were justified by an anti-corruption interest because the regulated entities had unusually close relationships with the candidates they supported. "[T]he need for contribution limitations to combat

corruption or the appearance thereof tends to decrease as the link between the candidate and the regulated entity becomes more attenuated." *Long Beach*, 603 F.3d at 696. Like the Chamber of Commerce PACs in *Long Beach*, here the ABA PAC and the Lincoln Club have indirect relationships with candidates. They lack the direct donor relationship that is the defining feature of a multi-candidate committee, or the historical interconnection with candidates that distinguishes political parties.

**[6]** The City's attempts to distinguish *Long Beach* are unpersuasive. It notes that while Long Beach prohibited groups from making any independent expenditures if their dues exceeded the contribution limit, San Diego's law allows organizations to collect membership fees without counting the dues as political contributions. This is a legally significant distinction between the San Diego and Long Beach laws, but the distinction is relevant only to the level of scrutiny and tailoring analyses. That distinction does not, however, change the decisive point here, which is that the City lacks a sufficiently important governmental interest to justify the law. The district court therefore correctly concluded that Plaintiffs are likely to succeed in showing that ECCO § 27.2936 violates the First Amendment.

## 2. ECCO § 27.2938: Temporal Ban on Contributions

**[7]** To support the district court's conclusion that the City's temporal ban is constitutional, the City argues that it reduces actual and perceived corruption because those contributions made near an election are clearer expressions of political speech, whereas off-year contributions are more likely linked to business the donor has before the city, thus creating the appearance of quid pro quo "corruption by the sale of influence." Indeed, the special character of early campaign contributions is so widely recognized that Emily's List, at one time the nation's "most successful PAC," takes its name from the familiar political aphorism that "Early Money Is Like

Yeast" because it "makes the dough rise." Roy A. Schotland, *Campaign Finance in Judicial Elections*, 34 Loy. L.A. L. Rev. 1489, 1497 n.10 (2001); Emily's List, Frequently Asked Questions, *http://emilyslist.org/who/faq/*.

Plaintiffs misread *Citizens for Clean Gov't* as holding the City to a higher evidentiary burden in this context that requires a specific showing of actual or perceived corruption. There we held that the district court improperly allowed the City to demonstrate its sufficiently important state interest with "hypothetical situations not derived from any record evidence or governmental findings" and "vague allusions to practical experience." 474 F.3d at 653-54. In requiring more detailed evidence, we employed a less deferential standard of review than we would have employed at the preliminary injunction phase, and we focused on the unique nature of San Diego's restriction "in the recall context." *Id*. at 650, 654. This reflected the Supreme Court's admonition in *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 391 (2000), that the "quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised."

Because "the regulations at issue in *Shrink* were similar to those in *Buckley*, the state's asserted interest was neither novel nor implausible. Therefore, the Court declined to impose, let alone articulate, a stringent evidentiary burden." *Citizens for Clean Gov't*, 474 F.3d at 652-53. *Shrink* dealt with direct contributions to candidates, 528 U.S. at 381, and *Buckley* established that a limit on the amount of such contributions is "only a marginal restriction upon the contributor's ability to engage in free communication" that can be justified by the government's interest in preventing "political *quid pro quo* from current and potential office holders," 424 U.S. at 20-21, 26. By contrast, *Citizens for Clean Gov't* involved limits on contributions to committees working to support or oppose candidates in recall elections, and "the City offer[ed]

no evidence of deliberation on the issue of campaign finance in recall elections, and it ha[d] no recourse to legal authority addressing these exact issues because none exists." 474 F.3d at 654. Therefore, we held "only that the district court erred by failing to require evidence clarifying the analogy between the state interest in *Buckley* and the one asserted here." *Id.*

**[8]** The heightened evidentiary requirement in *Citizens for Clean Gov't* stemmed from the novelty of limiting contributions to recall campaign committees, as opposed to limiting the sort of direct candidate contributions in normal campaign cycles addressed in *Buckley*. There is no such need to clarify the analogy to *Buckley* where § 27.2938 operates as a limitation on traditional direct candidate contributions. While *Buckley* addressed limits on the dollar amount of contributions and § 27.2938 restricts their timing, this distinction favors the City because a temporal ban is an even more "marginal restriction upon the contributor's ability to engage in free communication" than a dollar cap. *Buckley*, 424 U.S. at 20-21. Here the district court reasonably found that "[w]hile temporal limits do burden free speech and association, there is no evidence that the City's limit is more than a minimal burden."

**[9]** Thalheimer alleges in the verified complaint that his speech is burdened by the temporal ban because he wants to solicit and accept contributions now in advance of the 2012 election in order to be competitive against a potential incumbent opponent. However, the district court correctly determined that *Buckley* undercut the argument that a law that treats all parties equally can burden First Amendment rights by favoring incumbents. *See Buckley*, 424 U.S. at 31 ("Absent record evidence of invidious discrimination against challengers as a class, a court should generally be hesitant to invalidate legislation which on its face imposes evenhanded restrictions."). Nienstedt asserts a burden on his First Amendment rights because he wishes to contribute now to a candidate whose primary is more than a year away. However, the district court reasonably concluded that it was not a serious

burden for candidates to "merely be 'forced to rearrange their fundraising' by concentrating it in the 12-month window." (quoting *Gable v. Patton*, 142 F.3d 940, 951 (6th Cir. 1998)).

**[10]** Because this is an open question in our circuit, the district court's analysis of the temporal limitation relied largely on the Sixth Circuit's opinion in *Gable* and the Fourth Circuit's decision in *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705 (4th Cir. 1999). In *Gable*, a political candidate challenged various provisions of Kentucky's campaign finance law, including a prohibition on gubernatorial candidates accepting contributions during the 28 days preceding a primary or general election. 142 F.3d at 944. The Sixth Circuit acknowledged that candidates would "be forced to rearrange their fundraising by concentrating it in the period before the 28-Day Window begins," and that this "is not a trivial restriction." *Id.* at 951. Nonetheless, it concluded that the temporal limitation was constitutional because the court "read *Buckley* to say that such a restriction is justified by Kentucky's interest in combating corruption." *Id.*

In *Bartlett*, a political action committee and its president brought a First Amendment challenge to North Carolina's campaign finance law. One provision prevented lobbyists and political committees that employ lobbyists from contributing to state legislators and candidates while the legislature is in session. 168 F.3d at 714-15. The Fourth Circuit concluded that the provision "serves to prevent corruption and the appearance of corruption" because "[l]egislative action which is procured directly through gifts, or even campaign contributions, too often fails to reflect what is in the public interest, what enjoys public support, or what represents a legislator's own conscientious assessment of the merits of a proposal." *Id.* at 715. The court determined that the provision was tailored to the anti-corruption interest because it applied only to lobbyists and their affiliates, and the temporal limitation did "nothing more than place a temporary hold on appellees' ability to contribute . . . leaving them free to contribute during the

rest of the calendar year and to engage in political speech for the entire calendar year." *Id*.

Plaintiffs attempt to distinguish *Gable* and *Patton* by emphasizing that those cases involved shorter temporal limitations. The restriction in *Bartlett* was narrowed to cover a particular group of contributors thought to pose an especially strong threat of quid pro quo corruption, while the restriction in *Gable* was designed to bolster Kentucky's public financing regime. These distinctions do not make the essential reasoning of *Gable* and *Patton* any less persuasive, however; nor do they demonstrate that the City's law is not closely drawn to a sufficiently important state interest. The City has articulated an anti-corruption interest that is not novel or implausible, so it is not required to meet a heightened evidentiary burden.[3]

**[11]** The differences between the City's ordinance and the restrictions upheld in *Gable* and *Bartlett* are understandable given that the laws in those cases addressed partisan state elections, whereas ECCO regulates the financing of nonpartisan municipal campaigns. Moreover, "[w]e cannot determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives," and "[i]n practice, the legislature is better equipped to make such empirical judgments, as legislators have 'particular expertise' in matters related to the costs and nature of running for office. Thus ordinarily we have deferred to the legislature's determination of such matters." *Randall*, 548 U.S. at 248 (citations

---

[3]The City apparently made a tactical decision not to introduce specific evidence to support its anti-corruption interest at this early stage of the litigation so as to emphasize Plaintiffs' burden as the moving parties seeking preliminary injunctive relief. We would note, though, that our own case law contains a vivid illustration of corruption in San Diego municipal government involving campaign contributions timed to coincide with the donors' particular business before the city council. *See United States v. Inzunza*, ___ F.3d ___, 2011 WL 1365590 (9th Cir. April 12, 2011) (affirming the conviction of a former San Diego City Council member on charges stemming from a bribery scandal).

omitted). Plaintiffs' scant evidence of harm suffered from the temporal ban is not sufficient evidence of the sort of "danger signs" that would compel us to show less deference to the judgment of San Diego officials. *See id.* at 249.

### 3.  ECCO §§ 27.2950 and 27.2951: Ban on Organizational Contributions

Applying closely drawn scrutiny, the district court correctly determined that Plaintiffs were unlikely to succeed in their general challenge to the ECCO provisions making it unlawful for "non-individuals" to contribute directly to candidates, but likely to succeed in showing that the law is unconstitutional as applied to political parties.[4]

### a.  Non-Individual Contribution Ban

[12] The City contends that the prohibition on contributions by corporations, unions, committees, and other organizations serves the purpose of preventing the circumvention of individual contribution limits. The Supreme Court recognized the anti-circumvention interest in *FEC v. Beaumont*, 539 U.S. 146 (2003), which concerned a century-old federal statute barring corporations from contributing directly to candidates for federal office. North Carolina Right to Life, Inc., several of its officers, and a North Carolina voter challenged the constitutionality of the law as applied to nonprofit advocacy corporations. *Id.* at 149. The Court upheld such enforcement of the law, reasoning that "[n]onprofit advocacy corporations are . . . no less susceptible than traditional business companies to

---

[4]Plaintiffs acknowledge that the closely drawn standard of review is appropriate for contribution limits, but suggest that contribution bans should be treated differently. However, the Supreme Court has held that while it is "not that the difference between a ban and a limit is to be ignored . . . the time to consider it is when applying scrutiny at the level selected, not in selecting the standard of review itself." *FEC v. Beaumont*, 539 U.S. 146, 162 (2003).

misuse as conduits for circumventing the contribution limits imposed on individuals." *Id.* at 160.

Plaintiffs argue that *Beaumont* has been overruled by *Citizens United*, and that the anti-circumvention interest is no longer valid. They base this contention on the *Beaumont* Court's citations to *Austin*, which partially relied on an anti-circumvention rationale to uphold a limit on corporate political expenditures. *See Austin*, 494 U.S. at 664. Plaintiffs fail to recognize, however, that the *Citizens United* Court rejected *Austin* for its reliance on the distinct "anti-distortion" rationale that allowed spending restrictions based on the tendency of "immense aggregations of wealth" accumulated via the corporate form to tilt the political playing field. *See Citizens United*, 130 S. Ct. at 907. The anti-distortion interest is based on an equality rationale, *see id.* at 922 (Roberts, C.J., concurring), whereas the anti-circumvention interest is part of the familiar anti-corruption rationale, *see FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 456 (2001) ("*Colorado II*") ("[A]ll Members of the Court agree that circumvention is a valid theory of corruption.").

**[13]** Moreover, the *Citizens United* Court's disapproval of *Austin* came in the context of regulating political expenditures, not contributions. The Court made clear that it was not revisiting the long line of cases finding anti-corruption rationales sufficient to support such limitations. *See Citizens United*, 130 S. Ct. at 909 ("Citizens United has not made direct contributions to candidates, and it has not suggested that the Court should reconsider whether contribution limits should be subjected to rigorous First Amendment scrutiny."). Therefore, there is nothing in the explicit holdings or broad reasoning of *Citizens United* that invalidates the anti-circumvention interest in the context of limitations on direct candidate contributions. *See also Green Party of Conn. v. Garfield*, 616 F.3d 189, 199 (2d Cir. 2010) ("Although the Court's campaign-finance jurisprudence may be in a state of flux (especially with regard to campaign-finance laws regulat-

ing corporations), *Beaumont* and other cases applying the closely drawn standard to contribution limits remain good law.").

Alternatively, Plaintiffs argue that the City's ban on contributions by non-individuals is not closely drawn to the anticircumvention interest. They seek to distinguish *Beaumont* by noting that even though the Court upheld a total ban on corporate contributions, its tailoring analysis took into account that corporations retained the option of establishing political action committees that could make contributions to candidates. *See* 539 U.S. at 163. By contrast, the relevant ECCO provisions ban all non-individual contributions, so there is no PAC alternative. While this is a legitimate distinction, the *Beaumont* Court also stated that a "ban on direct corporate contributions leaves individual members of corporations free to make their own contributions, and deprives the public of little or no material information." *Id.* at 161 n.8.

More importantly, San Diego's regulations allow non-individual entities to make unlimited independent expenditures, and with ECCO § 27.2936 enjoined, they can also make unlimited contributions to independent committees that can be used to fund expenditures supporting or opposing candidates. *See Colorado II*, 533 U.S. at 455, 464-65 (weighing political parties' ability to make unlimited independent expenditures on behalf of candidates in the analysis of limits on parties' coordinated spending, which the Court treated the same as limits on direct contributions). While expenditures and contributions are different modes of political speech, it is the distinct nature of contributions that lessens the First Amendment rights of donors, and strengthens the government's regulatory power. *See id.* at 440-41 ("Restraints on expenditures generally curb more expressive and associational activity than limits on contributions do. A further reason for the distinction is that limits on contributions are more clearly justified by a link to political corruption than limits on other kinds of unlimited political spending . . .") (citations omitted).

In terms of both the fundamental First Amendment interests at stake and actual influence on the political process, an organization's ability to directly contribute $500 to a candidate pales in significance to its ability to make unlimited independent expenditures and unlimited donations to political action committees, which can in turn spend unlimited amounts supporting or opposing candidates.

Finally, Plaintiffs argue based on *Citizens United* that the City's contribution limits violate the First Amendment by discriminating against non-human speakers. The Court held in *Citizens United* that the "Government may not suppress political speech on the basis of the speaker's corporate identity." 130 S. Ct. at 913. While the scope of that holding has yet to be fully developed, the *Citizens United* opinion demonstrates concern about laws that target particular speakers, such as corporations, based on their status, whereas the City's law draws a functional line between individual donors and all non-individuals. The *Citizens United* Court struck down a law that raised the obviously troubling specter of criminal prosecution of certain corporations and individuals for releasing a politically themed movie, book, or pamphlet too close to an election, while others remained exempt from punishment. *See id.* at 888, 894-95. There is no such danger here, and indeed the *Citizens United* Court expressly did not extend its holding to the contribution context. *See also Minn. Citizens Concerned for Life, Inc. v. Swanson*, ___ F.3d ___, 2011 WL 1833236, (8th Cir. May 16, 2011) (holding that plaintiffs were unlikely to prevail in a First Amendment challenge to Minnesota's ban on direct corporate contributions to candidates because *Citizens United* did not overrule *Beaumont*'s holding that a state "can generally ban all direct corporate contributions").

### b.   Ban on Contributions from Political Parties

Since the district court issued its ruling, the City enacted a new provision, codified as ECCO § 27.2934, which allows

political parties to make contributions to candidates of up to $1,000 per election cycle. Plaintiffs initiated separate litigation challenging the constitutionality of the new provision and requesting a preliminary injunction. The district court denied the request for injunctive relief, allowing the City to enforce the new law pending final judgment. That litigation is not currently before us, but we must consider if the new law has rendered this aspect of the appeal moot.

[14] The City acknowledges that it adopted the new provision in direct response to the district court's earlier issuance of a preliminary injunction against enforcement of ECCO §§ 27.2950-51 as applied to political parties. We therefore conclude that this change does "not deprive the federal courts of jurisdiction to decide the constitutional question because of the well-settled principle that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Jacobus v. Alaska*, 338 F.3d 1095, 1103 (9th Cir. 2003) (quoting *Carreras v. City of Anaheim*, 768 F.2d 1039, 1047 (9th Cir. 1985)). "These concerns are of particular force in a case like the present one, in which the 'voluntary cessation' occurred only in response to the district court's judgment." *Id*.

As for Plaintiffs' likely success on the merits, the district court framed the matter as a choice between the Supreme Court decisions in *Colorado II* and *Randall*. Decided in 2001, *Colorado II* involved a challenge to the Federal Election Campaign Act's limits on political parties' coordinated expenditures. FECA capped coordinated spending between candidates and parties, based on district size and the relative cost of the media market. For candidates for the U.S. Senate, this ranged from $67,500 to $1,636,438. For candidates for the U.S. House of Representatives, it ranged from $33,780 to $67,560. Parties were also allowed to give up to $5,000 in direct contributions to candidates. 533 U.S. at 439 n.3, 442 n.7. The Court held that parties' coordinated expenditures should be treated the same as contributions, and that they

could be restricted to further the government's anti-circumvention interest. *Id.* at 456, 465.

In so ruling, the Court cautioned against treating political parties differently from other speakers for the purposes of analyzing contribution limits. *See id.* at 455-56 ("The Party's arguments for being treated differently from other political actors subject to limitation on political spending under the Act do not pan out . . . . [w]e accordingly apply to a party's coordinated spending limitation the same scrutiny we have applied to the other political actors . . . ."); *id.* at 454 (stating that a "party is not, therefore, in a unique position" compared with other contributors in terms of its coordinated spending); *see also Jacobus*, 338 F.3d at 1109 ("In fact, in *Colorado Republican II* the Court specifically rejected the contention that party contributions merited a stricter standard of scrutiny . . . .").

Five years later, however, the Supreme Court suggested that political parties do in fact have a special role requiring unique attention when analyzing contribution limits. In *Randall*, the Court confronted a challenge to Vermont's campaign finance statute, which included contribution limits for state races of $200 to $400 per candidate, per cycle, depending on the office, which applied equally to individuals, committees, and political parties. 548 U.S. at 238. For the first time, the Court held that a contribution limit violated the First Amendment by failing the closely drawn scrutiny standard of review. Justice Breyer's plurality opinion announced the judgment of the Court.[5] Acknowledging that "[s]ince *Buckley*, the Court has consistently upheld contribution limits in other statutes,"

---

[5]Therefore, we follow the plurality opinion as persuasive authority, though "not a binding precedent." *Texas v. Brown*, 460 U.S. 730, 737 (1983) (noting that a plurality opinion consisting of "the considered opinion of four Members of this Court" was not binding, but "should obviously be the point of reference for further discussion of the issue"). Justice Breyer's plurality opinion was joined by two justices, one in full and one in part. *Randall*, 548 U.S. at 235.

the plurality nonetheless concluded that "we must recognize the existence of some lower bound," and Vermont's very low contribution limits fell below that minimal threshold. *Id.* at 247-48.

The *Randall* plurality opinion directed courts to identify that threshold by scouring the record to look for "danger signs" that contribution limits are low enough to threaten "democratic accountability." *Id.* at 248-49. Among the "danger signs" in the Vermont case were the statute's treatment of political parties. The plurality noted that Vermont applied "its $200 to $400 limits—precisely the same limits it applies to an individual—to virtually all affiliates of a political party taken together as if they were a single contributor." *Id.* at 257. The limitations covered monetary contributions to candidates and "expenditures in kind" such as "stamps, stationery, coffee, doughnuts, gasoline, campaign buttons, and so forth," thus "severely limit[ing] the ability of a party to assist its candidates' campaigns by engaging in coordinated spending on advertising, candidate events, voter lists, mass mailings, even yard signs." *Id.*

The plurality also expressed concern that the limits would discourage voters lacking detailed knowledge of state legislative races from contributing small amounts to parties in the hope that the parties would then contribute to like-minded candidates. *Id.* at 257-58. The *Randall* plurality did not address the general statements in *Colorado II* about the treatment of political parties. However, it explained that the federal limits of at least $67,560 in coordinated spending and $5,000 in direct cash contributions for U.S. Senate candidates, and at least $33,780 in coordinated spending and $5,000 in direct cash contributions for U.S. House candidates, were "far less problematic" than Vermont's much lower $200-$400 contribution limits. *Id.* at 258. The plurality therefore concluded that the limitations at issue "would reduce the voice of political parties in Vermont to a whisper," and thus the "special party-related harms" were a factor weighing against the

constitutional validity of Vermont's contribution limits. *Id*. at 259.

It remains unclear whether the *Randall* plurality opinion actually supersedes *Colorado II* and holds that political parties must be treated differently than other contributors, or whether the analysis of "special party-related harms" was merely one case-specific factor. The Second Circuit recently concluded that with its focus on the integrity of the electoral process as a whole, as opposed to the expressive interest of the individual campaign contributor, the multifactor test in the *Randall* plurality opinion only "addressed *general* contribution limits that applied to *all* citizens." *Green Party*, 616 F.3d at 201. Accordingly, the *Green Party* court held that the *Randall* analysis did not apply to Connecticut's narrow contribution limits targeting only public contractors, lobbyists, and affiliated individuals and entities. *Id*. Here the City's law prohibits political party contributions as part of a comprehensive restriction on direct donations by all non-individual organizations, including political parties, corporations, partnerships, unions, and committees. This places the challenged provision somewhere between the Vermont statute that regulated the state's entire electoral process, and the Connecticut law in *Green Party* that targeted a narrow class of political speakers.

**[15]** The Supreme Court has directed that when a district court grants a preliminary injunction protecting First Amendment rights, "[i]f the underlying constitutional question is close . . . we should uphold the injunction and remand for trial on the merits." *Ashcroft*, 542 U.S. at 664-65. Given the close constitutional question here and the narrow nature of our inquiry at the preliminary injunction stage, we hold that the district court did not abuse its discretion in concluding that Plaintiffs were likely to succeed on the merits of their challenge to the application of these ECCO provisions to political parties. *See also Cal. Prolife Council Political Action Comm. v. Scully*, 164 F.3d 1189, 1190 (9th Cir. 1999).

## B.  Likelihood of Irreparable Harm, Hardship, and Public Interest

**[16]** Even where a plaintiff has demonstrated a likelihood of success on the merits of a First Amendment claim, he "must also demonstrate that he is likely to suffer irreparable injury in the absence of a preliminary injunction, and that the balance of equities and the public interest tip in his favor." *Klein v. City of San Clemente*, 584 F.3d 1196, 1207 (9th Cir. 2009). Here, before granting Plaintiffs' requests for preliminary injunctions against enforcement of ECCO § 27.2936 and §§ 27.2950-51 as applied to political parties, the district court correctly examined each necessary element and did not assume that they merely "collapse into the merits" of the First Amendment claim. *Cf. Dish Network Corp. v. FCC*, 636 F.3d 1139, 1144 (9th Cir. 2011).

As to irreparable harm, the district court followed a long line of precedent establishing that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Klein*, 584 F.3d at 1208 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "The harm is particularly irreparable where, as here, a plaintiff seeks to engage in political speech, as 'timing is of the essence in politics' and '[a] delay of even a day or two may be intolerable." *Id.* (quoting *Long Beach Area Peace Network v. City of Long Beach*, 522 F.3d 1010, 1020 (9th Cir. 2008)).

The district court separately determined that the public interest in upholding free speech and association rights outweighed the interest in continued enforcement of these campaign finance provisions. *See Sammartano v. First Judicial District Court, in and for County of Carson City*, 303 F.3d 959, 974 (9th Cir. 2002) ("Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles."). It also gave unique attention to the balance of hardships, concluding that the equities tipped in Plaintiffs'

favor because the burden of the restriction on their speech and associational rights outweighed the disruption to the City's campaign finance system. *See Klein*, 584 F.3d at 1208; *Sammartano*, 303 F.3d at 973.

## IV.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's decision to grant in part and deny in part Plaintiffs' request for a preliminary injunction. Each party shall bear its own costs on appeal.

**AFFIRMED.**